## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

GARY D. SMITH,

      Plaintiff,

v.                               No. CV 13-1011 MCA/CG

TIMOTHY TRAPP, M.D.; TIMOTHY MCMURRAY,
M.D.; LAURA VELEZ; CARLA EIDE, M.D.; and
JON HAMILTON, M.D.,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court upon *Defendants Correctional Healthcare Companies, Timothy Trapp, M.D., Timothy McMurray, M.D., Laura Velez, Carla Eide, M.D., and Jon Hamilton, M.D.'s* Martinez *Report* filed on October 14, 2015, (Doc. 47), and *Defendants Correctional Healthcare Companies, Timothy Trapp, M.D., Timothy McMurray, M.D., Laura Velez, Carla Eide, M.D., and Jon Hamilton, M.D.'s Supplement to* Martinez *Report* filed December 1, 2014, (Doc. 52), (together the "Motion"). Despite granting Plaintiff Gary D. Smith an extension of the deadline to file and serve his response to the Report, he failed to do so and the deadline of May 15, 2015 has passed. (Docs. 61, 65).

Plaintiff filed a *Civil Rights Complaint Pursuant to 42 U.S.C. § 1983* on October 17, 2013, (Doc. 1), and two supplemental complaints on November 25, 2013, (Docs. 8, 9), which the Court construes together as the Complaint.[1] Plaintiff asserts that

---

[1] The Court must construe the filings of a pro se litigant liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the Court should not go so far as to serve as the pro se litigant's advocate. *Id.* Plaintiff must follow the same procedural rules that govern other litigants. *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994). Plaintiff filed several additional amended and supplemental pleadings, (*see* Docs. 4, 10,

Defendants violated his Eighth, Ninth, and Fourteenth Amendment rights and were medically negligent by failing to provide him with adequate medical care for a number of serious medical conditions while he was in jail.

This matter was referred to this Court to make proposed findings of fact and recommend a disposition by Chief Judge Armijo. (Doc. 68). The Court finds that Plaintiff has failed to show that a disputed material fact exists as to any of his claims. Therefore, the Court **RECOMMENDS** that the Motion for Summary Judgment be **GRANTED** and the Complaint be **DISMISSED**.

## I.     Background

Plaintiff is an inmate who was incarcerated at Bernalillo County Metropolitan Detention Center ("BCMDC") in Albuquerque, New Mexico from December 28, 2012 until June, 2014.[2] (Doc. 32 at 8; Doc. 47 at Ex. A). Plaintiff contends that while he was an inmate at BCMDC, Defendants, who are employed at BCMDC, violated his constitutional rights and were medically negligent by failing to: (i) provide him with necessary treatment for his hearing problem; (ii) provide him with dental care; (iii) order an MRI of his right shoulder; and (iv) provide him with a surgical option for a hernia condition. (Docs. 8 & 9). He further complains that Defendant Trapp and Defendant McMurray did not allow him access to numerous medications, vitamins, and supplements to treat his several ailments, deficient immune system, and epilepsy condition. (Doc. 1).

---

& 11), but those pleadings were dismissed in their entirety by United States Chief District Judge M. Christina Armijo, along with several other claims and defendants. (Doc. 22).
[2] Plaintiff was arrested on December 28, 2012 for charges related to stalking and property damage, and placed at BCMDC while awaiting trial. (Doc. 47 at 8). He subsequently pled guilty to stalking in June, 2014, and was remanded to the custody of the New Mexico Department of Corrections. (*Id.*).

Defendants move for summary judgment on all of the claims asserted by Plaintiff against them. Defendants contend that Plaintiff received significant medical treatment while housed at BCMDC, and that Plaintiff has failed to show that Defendants were deliberately indifferent to his serious medical needs. Defendants also argue that Plaintiff does not state a claim for relief as to several of his grounds. Plaintiff did not respond to Defendants' Motion for Summary Judgment.

## II.    Standard of Review

The Court shall grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Id.* Movants who do not bear the burden of persuasion at trial, such as Defendants, need not negate the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Such a movant only bears the burden of making a prima facie demonstration that there is no genuine issue of material fact, and may do so by pointing out a lack of evidence on an essential element of the nonmovant's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323, 325).

If the moving party has demonstrated an absence of material fact, then the "nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted). The mere existence of some evidence in support of

the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmoving party on that issue. *See Anderson*, 477 U.S. at 249. The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him. *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir.1995). To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein. *See Adler*, 144 F.3d at 671.

The Court directed Defendants to compile and file a *Martinez* Report for the purpose of investigating the incident underlying this lawsuit, and "develop a record sufficient to ascertain whether there are any factual or legal bases for the prisoner's claims." (Doc. 17 at 2) (quoting *Hall*, 935 F.2d at 1109). "On summary judgment, a *Martinez* report is treated like an affidavit, and the court is not authorized to accept its fact findings if the prisoner has presented conflicting evidence." *Northington v. Jackson,* 973 F.2d 1518, 1521 (10th Cir. 1992). A plaintiff's complaint may also be treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and is sworn under penalty of perjury. *Hall*, 935 F.2d at 1111.

The Court explained to the parties that the *Martinez* Report may be used in deciding whether to grant summary judgment, either upon a motion by one of the parties, or sua sponte. (Doc. 34 at 5–6; Doc. 43 at 6; Doc. 50 at 2; Doc. 61 at 2–3). The parties were also urged to submit whatever arguments and materials they consider relevant to Plaintiff's claims in the *Martinez* Report, Response, and Reply. *Id.*

4

**III.    Undisputed Facts**

The following facts are either uncontroverted, or related in the light most favorable to Plaintiff as the nonmoving party.

A.    *Facts Related to Plaintiff's Hearing Condition*

On February 15, 2013, Defendants became aware that Plaintiff was having difficulty hearing as a result of substantial wax buildup in both his left (75% wax buildup) and right (90% wax buildup) ears. (Doc. 47, Ex. E). Two days later, Plaintiff was examined by Lyndzy McKay, L.P.N., who noted that Plaintiff "presents with bilateral cerumen blockage to ear canals," that there were no signs of infection, and that the wax was hard and difficult to manipulate. (*Id.*, Ex. F). Nurse McKay ordered cerumen breakdown drops to treat the wax and planned to irrigate Plaintiff's ears once the wax softened. (*Id.*). Plaintiff was educated on how to administer the cerumen breakdown drops himself. (*Id.*).

On February 19, 2013, Plaintiff was prescribed a two-week regimen of Carbamide Peroxide drops for his excessive ear wax, which is designed to remove excessive ear-wax buildup oftentimes without the need for any other treatment or irrigation. (Doc. 47 at 12 ¶ 13; *Id.*, Ex. G ¶ 68).

On March 1, 2013, Plaintiff requested a "cystoscopy." (Doc. 47, Ex. H). He was informed that hearing tests cannot be performed at BCMDC. (*Id.*). The following day he was prescribed a second, two-week regimen of Carbamide Peroxide by Defendant Trapp. (*Id.*, Ex. G ¶ 64). On March 20, 2013, Defendant Trapp prescribed Plaintiff a three-week regimen of Aprodine for Eustachian Tube Dysfunction, a condition that causes diminished hearing capacity. (*Id.* at 12 ¶ 6; *Id.*, Ex. G ¶ 61).

On March 25, 2013, Plaintiff was evaluated by Sarah Martinez, R.N. Ms. Martinez performed a full Ear Complaint evaluation and completed associated protocol paperwork. (Doc. 47, Ex. I). Later that day, Plaintiff requested to be seen by Defendant Trapp concerning his hearing problems. (*Id.*, Ex. J).

On April 1, 2013, Plaintiff was provided a three-month prescription of Loratadine by Defendant Trapp to treat symptoms of allergic rhinitis associated with Eustachian Tube Dysfunction. (Doc. 47, Ex. G ¶ 60). Seven days later, Plaintiff requested a follow-up appointment with Defendant Trapp. (*Id.*, Ex. K). On April 26, 2013, Plaintiff was seen by Defendant Trapp, who observed that Plaintiff was concerned about how his hearing was being affected by his Eustachian Tube Dysfunction, and wanted more Aprodine. (*Id.*, Ex. L). Defendant Trapp observed inconsistencies in Plaintiff's ability to hear, stating: "[w]hen I tap on door lightly, [Plaintiff] responds instantly, but when ever in hallway walks around cupping ear." (*Id.*). Defendant Trapp provided Plaintiff with a three-month prescription for Aprodine for his Eustachian Tube Dysfunction. (Doc. 47, Ex. G ¶ 53).

On April 28, 2013, Plaintiff was seen by Charmi Cronk, P.A., for difficulty hearing. (Doc. 47, Ex. L). He told her that he previously used Flonase nasal spray to help with his allergy symptoms, and that he was having yellowish sinus drainage and nasal congestion. (*Id.*). The following day, Ms. Cronk prescribed Plaintiff Flunisolide Nasal Spray (Nasarel .0025%) for sinusitis and Eustachian Tube Dysfunction. (*Id.*, Ex. G ¶ 52).

On May 20, 2013, Plaintiff was treated by Vikram Alladi, M.D., for "new onset deafness" in his left ear, and reported that he began experiencing decreased hearing

6

and congestion in his ear approximately three weeks after entering BCMDC. (Doc. 47, Ex. M). Dr. Alladi prescribed Plaintiff a 10-day course of the antibiotic Amoxicillin for the purpose of combatting possible infection. (*Id.*, Ex. G ¶ 51).

On June 4, 2013, Plaintiff was treated by Defendant Velez, a Licensed Master Social Worker. (Doc. 47, Ex. N). Plaintiff told Defendant Velez that "his hearing loss ha[d] not worsened in the last thirty days." (*Id.*). On June 30, 2013, Ms. Cronk provided Plaintiff with another three-month prescription for Loratadine to treat his allergic rhinitis and associated Eustachian Tube Dysfunction. (*Id.*, Ex. G ¶ 40).

On September 20, 2013 Plaintiff requested health services for his decreased hearing, but when he was seen by a Registered Nurse he stated his problems had resolved. (Doc. 47 at 15 ¶ 19; *Id.*, Ex. O). On December 10, 2013, Plaintiff was again evaluated by Dr. Alladi for diminished hearing capacity, who subsequently started him on a 10-day course of Claritin. (*Id.*, Ex. P; *Id.*, Ex. G ¶ 15).

On January 27, February 5, and March 21, 2014, Plaintiff made separate requests to be sent outside of BCMDC for a battery of hearing tests. (Doc. 47, Exs. Q, R, & S).  (*See, e.g.*, "Ear Dr. exam and treatments for hearing loss of left ear and punctured right ear drum caused by MDC Medical Staff!!!").

### B.   *Facts Related to Plaintiff's Dental Care*

On March 22, 2013, Plaintiff was examined by a dental physician, who noted that he had a chipped tooth but did not require any urgent dental work. (Doc. 47, Ex. T). Three days later, Plaintiff was examined by Ms. Martinez, and Plaintiff did not report having any dental problems at that time. (*Id.*, Ex. I).

The first mention of damage to Plaintiff's teeth at the hands of BCMDC staff was on January 27, 2014. (Doc. 47, Ex. U). Plaintiff made a request for health services outside of the facility, and alleged that damage to his teeth had been caused by BCMDC staff between January and March of 2013. (*Id.*). He made another two, almost identical demands and complaints in February, 2014. (*Id.*, Exs. V & W).

On February 8, 2014, Plaintiff reported toothaches in two separate teeth. (Doc. 47, Ex. X). Treating staff observed a "lower anterior hairline crack," that the "upper left tooth [was] chipped," and that "no interior or exterior edema or inflammation [was] noted." (*Id.* at 4). Plaintiff described his pain as five out of a possible 10, and declined dental services and pain medications, since the problems he was experiencing were not emergent and Plaintiff wanted dental care outside of BCMDC and transport. (*Id.*). He was provided education by staff on ways to alleviate the pain he was experiencing. (*Id.*).

On February 26, 2014, Plaintiff submitted a fourth medical request form, asking for a dental exam for his damaged teeth and a dental cleaning, again alleging that damage to his teeth was caused by unidentified BCMDC staff in early 2013. (Doc. 47, Ex. Y). On March 27, 2014, Plaintiff was seen by a dental physician, who noted that Plaintiff did not require any urgent treatment, had no loose teeth, observed an upper-left premolar crack, and advised Plaintiff that he had enamel wear caused by grinding his teeth. (*Id.*, Ex. Z).

C.    *Facts Related to Plaintiff's Right Shoulder*

Plaintiff's pre-incarceration medical records show that Plaintiff sustained a shoulder injury while in the military, which has resulted in some future degenerative changes. (Doc. 52, Ex. VA2). He was seen by an orthopedist in September, 2011, who

he told that he had been experiencing right-shoulder pain since 2009. (*Id.*, Ex. VA19). An x-ray was taken of the shoulder, and degenerative joint disease with tendinopothy was diagnosed. (*Id.*). Plaintiff was instructed to complete various prescribed exercises and provided a prescription of Naprosyn. (*Id.*). Plaintiff was compliant with doing the exercises, but continued to describe right shoulder pain with a limited range of movement to physicians throughout 2011. (*Id.*, Exs. VA21, VA22, & VA23).

On March 31, 2013, Plaintiff requested that BCMDC take an MRI of his right shoulder. (Doc. 47, Ex. H). Plaintiff did not state why he was making the request. (*Id.*). He was subsequently informed that MRIs could not be performed at BCMDC. (*Id.*).

On May 20, 2013, Plaintiff was examined by Dr. Alladi. (Doc. 47, Ex. M). He complained of right shoulder pain and again requested an MRI of his shoulder. Dr. Alladi explained that an MRI would have to be done outside of BCMDC, but that Plaintiff's shoulder could be evaluated with a regular x-ray at BCMDC. (*Id.*). Dr. Alladi ordered x-rays of Plaintiff's right shoulder, and x-rays were taken on May 22, 2013. (*Id.*, Ex. DDD). The results of the x-ray were negative. (*Id.*, Ex. VV at 2).

On January 27, February 5, and February 26, 2014, Plaintiff made three separate requests for an MRI of his right shoulder to be taken outside of BCMDC, and alleged for the first time that the damage caused to his right shoulder was due to BCMDC staff in February, 2013. (Doc. 47, Exs. Q, R, & Y).

On April 1, 2014, Plaintiff was seen for a follow-up appointment, and stated that he had right shoulder pain and could not abduct or hyper-abduct his shoulder. (Doc. 47, Ex. VV). Health care staff noted that Plaintiff had "good range of movement and was able to hyper-abduct when asked to take his shirt off" but that after he took off his shirt,

was no longer able to hyper-abduct or otherwise move his shoulder. (*Id*. at 2). Plaintiff

was provided with Tylenol for pain management. (*Id*.).

      D.    <u>Facts Related to Plaintiff's Hernia</u>

      Plaintiff states that he developed a hernia as a result of numerous transports

between BCMDC and court, and that the first hernia injury occurred in February, 2013.

(Doc. 8 at 2). Plaintiff first noticed the hernia in the shower on March 7, 2013. (*Id*.). He

states that on March 8, 2013, he began to experience extreme pain due to his hernia.

(*Id*.). On March 9 and March 11, 2013, he made separate complaints to "SARNA,"

which he states were "absolutely no help."[3] (*Id*.).

      On March 19, 2013, Defendant Trapp indicated for the first time that Plaintiff had

an "indirect hernia" on his right side, but that it only "protrudes out on valsalva," a

technique used to increase pressure in the lower abdomen. (Doc. 47 at 19 ¶ 36; *Id*., Ex.

AA). Defendant Trapp's medical plan was to request more information from the VA

Hospital. (*Id*.). Defendant Trapp did not note that Plaintiff was in any pain. (*Id*.).

      On March 30, 2013, Kristi Downing noted that Plaintiff had been provided a

hernia belt for a "right sided (suspected) inguinal hernia." (Doc. 47, Ex. BB). Plaintiff was

instructed how to use the hernia belt. (*Id*.).

      On April 4, 2013, Plaintiff submitted a health services request form stating that

"my hernia is worst, worst, worst and bigger with much, much, much more pain, pain,

pain." (Doc. 47, Ex. CC) He was seen by medical personnel, his vitals were taken with

no anomalies noted, and it was indicated that Plaintiff had been seen by a medical

provider for his hernia and provided a hernia belt. (*Id*.). Plaintiff was seen by Defendant

---

[3] The Court is unsure to what or whom "SARNA" refers.

Eide on April 18, 2013 for mental health services, and she observed that Plaintiff was using a hernia belt, and claimed to have lower-right quad pain generally. (*Id.*, Ex. BB). Defendant Eide stated that "nursing will refer to medical." (*Id.*).

On April 21, 2013, Plaintiff fell to the floor while walking, and medical personnel were called to assist him and assess his injuries.[4] (Doc. 47, Ex. DD). Taileigh Sanchez, R.N. noted that Plaintiff reported pain due to his hernia. (*Id.*). He was placed in a wheelchair and taken to the medical unit, where he refused ibuprofen, Tylenol, and naproxen. (*Id.*). Plaintiff would not permit a full examination and wanted to be seen by a provider. (*Id.*). He was returned to his pod unit. (*Id.*).

On April 22, 2013, Kaaki Garner, R.N. examined Plaintiff for hernia pain. (Doc. 47, Ex. EE). The hernia was observed as being small, with no presence of redness and no signs of swelling. (*Id.*). He was prescribed Tylenol for pain, despite his refusal to take Tylenol the day prior, and Ms. Garner determined that Plaintiff should continue to wear his hernia belt. (*Id.*).

Plaintiff states between April 22 through April 24, he was bed-ridden and that Defendant Velez visited him at his bedside. (Doc. 8 at 2). Plaintiff was seen by Defendant Velez, who noted that Plaintiff was being cleared to solitary confinement due to medical issues and his classification, and that Plaintiff had not been eating or getting out of bed for two days, except for using the bathroom and walking to the medical unit on April 22, 2013. (Doc. 47, Ex. EE). She noted that Plaintiff was in pain, grimaces, sighs, and groans. (*Id.*).

---

[4] Plaintiff states in the Complaint that on this date, he was sent to the medical unit for two-and-a-half hours and provided absolutely no assistance whatsoever. (Doc. 8 at 2). The medical records provided by Defendants rebut Plaintiff's unsubstantiated statement, and the Court does not find the fact to be in dispute.

On April 26, 2013, Plaintiff was seen by Defendant Trapp, who assessed an inguinal hernia. (Doc. 47, Ex. FF). Defendant Trapp wrote that Plaintiff described his pain as "terrible" and that he wanted to get his hernia "fixed." (*Id.*). On April 28, 2013, Plaintiff met with Ms. Cronk. (*Id.*). He told her that his hernia was aggravated by activity such as walking and that sometimes it just suddenly hurts.[5] (*Id.*).

On May 15, 2013, Plaintiff met with Defendant Eide for mental health services, and complained about his hernia. (Doc. 47, Ex. GG). She told him that unless his hernia was life threatening, he would not be able to get surgery. (*Id.*). Five days later, Dr. Alladi examined Plaintiff and noted that the hernia has not gotten any worse. (*Id.*, Ex. HH). Dr. Alladi observed there was no evidence of obstruction or "incarceration" of the hernia, and he educated Plaintiff on the appropriate time to seek surgical intervention for his hernia.6 (*Id.*). He also did not indicate that Plaintiff complained of pain during the visit. (*Id.*).

On May 31, 2013, Plaintiff was treated by Erin Bennett, R.N. after it was reported that Plaintiff was sitting in a chair in the shower/sink area complaining of hernia pain. (Doc. 47, Ex. II). She examined the hernia, noted no discoloration to the hernia site, observed that it was retractable, assisted Plaintiff back to his bunk, and provided him with a one-time dosage of Acetaminophen. (*Id.*).

---

[5] Plaintiff claimed he was in infirmary isolation, and received no assistance whatsoever between April 24 and 28, 2013. (Doc. 8 at 2). The evidence provided by Defendants rebuts that contention, and the Court finds that Plaintiff's unsubstantiated statement does not put this fact into dispute.

[6] A hernia becomes incarcerated when part of the fat or small intestine from inside the abdomen becomes stuck in the groin or scrotum and cannot go back in the abdomen, and a health care provider is unable to massage the hernia back into place. NAT'L INST. OF DIABETES AND DIGESTIVE KIDNEY DISEASES, *Inguinal Hernia*, (May 2014), http://www.niddk.nih.gov/health-information/health-topics/digestive-diseases/inguinal-hernia/Pages/facts.aspx http://www.niddk.nih.gov/health-information/health-topics/digestive-diseases/inguinal-hernia/Pages/facts.aspx.

On the morning of June 1, 2013, Plaintiff claims he was bed-ridden due to hernia pain. (Doc. 8 at 2). On June 7, 2013, he was seen by the University of New Mexico Hospital Urology Department, primarily for a consultation regarding his history of bladder cancer, upon referral by Defendant Trapp. (Doc. 47, Ex. JJ). Plaintiff requested a surgical consultation from the UNM General Surgery Department for his inguinal hernia during the examination. (*Id.*). On June 10, Plaintiff was referred to general surgery for his hernia. (*Id.*, Ex. KK).

Plaintiff states that throughout June and July, 2013, he was in extreme pain due to his hernia. (Doc. 8 at 2). On July 13, 2013, Plaintiff was observed lying in his bunk complaining of pain near the hernia site. (Doc. 47, Ex. KK). No redness or necrosis was observed near the site, and his vital signs were within normal range. (*Id.*). Defendant Trapp prescribed him Tylenol for pain. (*Id.*). Later that evening, a follow-up visit was conducted, and Plaintiff was observed resting in bed comfortably in no apparent distress. (*Id.*). Plaintiff was instructed to notify security if pain or discomfort returned. (*Id.*).

Plaintiff states that on several occasions during September, unidentified medical personnel refused to help him with his hernia and told him that no medical care would be provided to him for his hernia. (Doc. 8 at 6).

On September 24, 2013, Plaintiff submitted a health care request form, and for the first time alleged that his hernia was caused during a prison transport. (Doc. 47, Exs. LL & MM). He also claimed to have received an order from the trial court in his criminal case to be treated for his hernia. (*Id.*). On October 1, 2013, Plaintiff was seen by the General Surgery Department at UNM Hospital, and scheduled for surgery. (*Id.*,

Ex. NN). Surgical repair of Plaintiff's right inguinal hernia took place on October 30, 2013. (*Id.*, Ex. OO). The performing surgeon observed that Plaintiff described his hernia as causing him "some occasional discomfort at times," and that Plaintiff denied any obstructive symptoms such as nausea, vomiting, obstipation, or constipation. (*Id.* at 2).

After surgery, Plaintiff was provided with numerous follow-up visits, pain medicines, and wound-care treatment. On April 1, 2014, Plaintiff's hernia site was observed by medical staff to be "looking good," with no signs of recurrence, redness, erythema, or tenderness. (Doc. 47, Ex. VV).

Defendant Trapp testified that Plaintiff suffered from a hernia while incarcerated at BCMDC, but that it was not incarcerated or life threatening because there was no section of bowel that was at risk of strangulation. (Doc. 47, Ex. WWW at 1). He also determined that because the hernia protruded only during a valsalva test, and otherwise did not normally protrude, it would not have caused severe pain. (*Id.* at 2). Further, Defendant Trapp stated that Plaintiff complained of pain intermittently during the time that he was suffering from his hernia. Since Plaintiff's hernia condition was not life threatening, the UNM General Surgery Department did not schedule an appointment with Plaintiff until October 1, 2013, which was over one month after Plaintiff was referred to that department by Defendant Trapp. (*Id.*).

### E.    *Facts Related to Plaintiff's Medications and Prescriptions*

On December 28, 2012, during Plaintiff's initial medical intake at BCMDC, Plaintiff stated that he did not have any medical problems requiring immediate medical attention, had not been seen by a doctor within the previous six months, and was unaware of any medication he was currently taking. (Doc. 47, Ex. WW). On the same

day and pursuant to a separate mental health intake, Plaintiff alerted BCMDC to his

history of seizures, and that he was taking Clonazepam to treat his seizures. (*Id.*).

Plaintiff was subsequently released from BCMDC, but re-arrested on January 2,

2013. (Doc. 47 at 28). During his intake on that date, he again asserted that he did not

have any medical problems requiring immediate medical attention and that he did not

have any medical problems that the facility personnel should know about. (Doc. 47, Ex.

YY). Plaintiff explained that his past medical history only included seizures and arthritis,

but he was unable to identify medications he was receiving to treat those ailments. (*Id.*).

Dilantin was administered to Plaintiff to prevent seizures. (*Id.*). During his mental health

screening that day, he mentioned he had been taking Clonazepam for seizures. (*Id.*, Ex.

ZZ).

On January 4, 2013, Defendant McMurray prescribed Plaintiff with a three-month

course of Dilantin for his seizure disorder. (Doc. 47, Ex. G ¶ 81). The same day, Plaintiff

submitted a release of his medical records to the New Mexico VA Healthcare System so

that his previous medications could be verified by BCMCD health care workers. (*Id.*, Ex.

AAA).

On January 5, 2013, Plaintiff was seen by Michael A. Vigil, M.D. (Doc. 47, Ex.

BBB). Plaintiff relayed that he had primary medical histories of prostate cancer, prostatic

hypertrophy, temporal lobe seizures/epilepsy, and arthritis, and had been experiencing

claustrophobia, and that he wanted to restart his medications and prescriptions. (*Id.*).

Dr. Vigil started Plaintiff on prophylactic doses of Dilantin in order to prevent any risk of

seizures. (*Id.*). Plaintiff requested that he be restarted on all of his prescriptions

monitored by the VA Hospital, and a second request for Plaintiff's medical records was made to the VA Hospital. (*Id.*).

On January 13, 2013, Plaintiff informed Ms. Cronk that he takes "something" for his prostate, fiber for irregularity, a multivitamin, and two kinds of nasal spray. (Doc. 47, Ex. CCC). Plaintiff's treatment plan was not amended or altered at that time. (*Id.*).

On January 18, 2013, Plaintiff was evaluated by Dr. Vigil. (Doc. 47, Ex. FFF). Plaintiff reported that he had not had any seizure activity of any kind since his incarceration. Dr. Vigil noted that his VA records had not been received yet. (*Id.*).

On January 30, 2013, Plaintiff was seen by Defendant McMurray. (Doc. 47, Ex. GGG). Plaintiff reported that he had not had any recent seizure activity and stated that he was taking Klonipin to manage his seizures before incarceration. (*Id.*). However, on February 5, 2015, Plaintiff reported having a seizure within the past month. (*Id.*, Ex. HHH).

On February 18, 2013, during a psychiatric evaluation, Plaintiff's physician noted that Plaintiff stated he had been diagnosed in 2003 by the VA Hospital with temporal lobe epilepsy, and suffered a seizure over the weekend which resulted in biting his own tongue. (Doc. 47, Ex. III). He claimed to have between 50 and 150 seizures per day, and that the primary effect of his epilepsy condition was on his memory. (*Id.*). He also stated that he had been taking Clonazepam for his epilepsy condition, and not Klonipin. (*Id.*).

On March 14, 2013, Defendant Eide made a note that Plaintiff met with his treatment team because he had bit his tongue during a seizure but could not recall what

medications he was on prior to incarceration at BCMDC. Plaintiff was referred to a lab draw to check his Dilantin levels. (Doc. 47, Ex. JJJ).

On April 2, 2013, Plaintiff met with Defendant Velez, who noted that Plaintiff reported having no new seizures lately. (Doc. 47, Ex. KKK). Three days later, Plaintiff obtained a three-month prescription of Dilantin from Defendant Trapp. (*Id.*, Ex. G ¶ 58).

On May 20, 2013, Dr. Alladi examined Plaintiff, and noted Plaintiff's history of temporal lobe epilepsy with absence attacks, that he had previously taken Lamictal, Keppra, and Tegretol, and that he had been medication-free for some time until being prescribed Dilantin at BCMDC. (Doc. 47, Ex. M). He told Dr. Alladi that he was not aware of when he has seizures, and denied any grand mal attacks. (*Id.*).

On June 13, 2013, during a follow-up appointment, Plaintiff reported experiencing six seizures over the previous three months. (Doc. 47, Ex. LLL). At a subsequent follow-up visit on August 20, 2013, he stated that he was put on Klonopin for his seizures prior to incarceration, but was unable to explain how often he experiences seizures because his seizures are more like daydreaming than tonic/clonic seizures. (*Id.*, Ex. MMM). Plaintiff stated that he did not want his Dilatin renewed, and it was not re-prescribed. (*Id.*). Plaintiff asked not to be prescribed any other medications for his seizures because he had tried many medications in the past and was eventually taken off all of them. (*Id.*).

On November 4, 2013, Plaintiff reported no new seizures, and requested Klonipin for seizure-management. (Doc. 47, Ex. RR). Staff explained that "PSU" needed to give approval for any such request. (*Id.*).

In December, 2013, Plaintiff made several separate requests for Clonazepam for his seizure disorder. (Doc. 47, Exs. NNN & OOO). He was subsequently provided

prescriptions for Keppra by Dr. Alladi. (*Id.*, Ex. G ¶¶ 12–14). In January, 2014, Plaintiff again requested Clonazepam, and was subsequently evaluated. (*Id.*, Exs. PPP, QQQ, & SSS). Plaintiff reported experiencing 50 seizures per day, with worsening severity. (*Id.*, Ex. SSS). On February 3, 2013, he received a prescription for Tegretol from Michelle Lucero, M.D., to treat his seizures. (*Id.*, Ex. G ¶ 8). Two days later, Plaintiff explained to BCMDC's Mental Health Unit that he was "having more seizures than ever"; his self-reports of these incidents could not be corroborated by correctional officers. (*Id.*, Ex. TTT).

On March 4, 2013, Plaintiff was seen for another follow-up appointment and stated that he had never experienced a grand mal seizure before. (Doc. 47, Ex. UUU). He was taken off Keppra and Tegretol for that reason, but placed on Depakote for absence seizures. (*Id.*; Doc. 47, Ex. G ¶ 5). On April 1, 2013, Plaintiff again reported that he was experiencing seizures and that he had petit mal epilepsy. (*Id.*, Ex. VVV). However, medical personnel noted that it was not clear whether Plaintiff was actually experiencing anxiety or seizures. (*Id.*). They submitted another request for information from the VA Hospital. (*Id.*).

Plaintiff's medical records were never received by BCMDC from the VA Hospital. (Doc. 47 at ¶ 75). Plaintiff was administered a number of medications over the course of his incarceration at BCMDC, including multivitamins, pain-alleviating medications, medications to treat dry skin, medications to treat Plaintiff's seizure disorder, medications to treat Plaintiff's bowel irregularities and constipation, prostate and prostatic hypertrophy medications, allergy medications, gastroesophageal reflux disease, and chronic obstructive pulmonary disease. (*See* Doc. 47, Ex. G).

Plaintiff's pre-incarceration medical records show that Plaintiff was diagnosed with having temporal seizures sometime between 2003 and 2004. (Doc. 52, Ex. VA9). He was prescribed numerous medications for his condition over a long period of time, including Lamotrigine, Tegretol, Neurontin, and Keppra. (*Id.*). In January, 2011, Plaintiff transitioned from taking to Keppra to Clonazepam because Keppra was affecting his sleep. (*Id.*, Exs. VA12, VA13, & VA14). Plaintiff reported to his medical providers at the VA Hospital that he was still taking Clonazepam for his seizures in May and July, 2011. (Id., Exs. VA16 & VA17).

## IV.  Analysis

Plaintiff brings suit under 42 U.S.C. § 1983, alleging that Defendants violated his Eighth, Ninth, and Fourteenth Amendment rights and were medically negligent by failing to properly treat his hearing condition, his chipped and/or cracked teeth, his right shoulder, and his hernia. He also maintains that Defendants Trapp and McMurray denied him regular access to a litany of medicine, vitamins, and supplements which have been or are currently prescribed to him

Defendants filed a *Martinez* Report and moves for summary judgment, arguing that Plaintiff has failed to demonstrate that a genuine issue of material fact exists as to his Fourteenth Amendment and medical negligence claims. As explained above, Plaintiff did not respond to the Motion for Summary Judgment. The Court will also review Plaintiff's Eighth and Ninth Amendment claims pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 12(b)(6).

A.   _Deliberate Indifference to a Serious Medical Need_

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment's Due Process Clause. Specifically, Plaintiff maintains that Defendants failed to properly treat him for his: (i) hearing condition; (ii) his chipped and/or cracked teeth; (iii) his right shoulder injury; and (iv) his hernia. He also maintains that Defendant Trapp and Defendant McMurray denied him regular access to a litany of medicines, vitamins, and supplements prescribed to treat his various ailments, deficient immune syndrome, and epilepsy condition. Defendants respond that they were not deliberately indifferent to Plaintiff's medical needs and that he was provided with appropriate medical treatment, and has failed to demonstrate any constitutional violations.

Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment's prohibition on cruel and unusual punishment. _Lopez v. LeMaster_, 172 F.3d 756, 759 n.2 (10th Cir. 1999). However, in determining whether a pretrial detainee's rights under Due Process Clause were violated during confinement, the court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983. _Id._

The Eighth Amendment is implicated when a prison official is deliberately indifferent to a substantial risk of serious harm. _Farmer v. Brennan_, 511 U.S. 825, 828 (1994). A prison official violates the Eighth Amendment when (i) objectively, the deprivation alleged is sufficiently serious; and (ii) the official has "a sufficiently culpable state of mind." _Farmer_, 511 U.S. at 834 (internal quotations omitted). The minimum standard for providing medical care to a pre-trial detainee under the Fourteenth

Amendment's Due Process Clause is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner; the standard is violated by a government official's deliberate indifference to a serious medical need. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 649 (5th Cir. 1996); *see also Berry v. City of Muskogee*, 900 F.2d 1489, 1493 (10th Cir. 1990).

In determining whether conditions of confinement violate the Eighth Amendment and therefore satisfy the objective element that the alleged deprivation is sufficiently serious, the Court is required to consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citations omitted). A delay in providing medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Id.* at 1210 (quotation omitted). "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quotation omitted).

To prevail on the subjective component, a plaintiff must show "that the defendants knew he faced a substantial risk of harm and disregarded that risk . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (internal citations omitted). Mere

negligence by prison officials or medical staff will not suffice to meet the subjective prong of deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (10th Cir. 1976); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). Moreover, a "prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999). A prisoner cannot show deliberate indifference by arguing that prison doctors were pursuing a course of treatment which the Plaintiff felt was ineffective or even negligent. *See, e.g.*, *Taylor v. Ortiz*, No. 10-1079, 410 Fed. Appx. 76 (10th Cir. Nov. 19, 2010) (unpublished) (no constitutional violation when doctors chose not to provide plaintiff with a more advanced "combination treatment" for hepatitis C which would have protected plaintiff from liver cirrhosis or cancer); *Johnson v. Standifird*, No. 10-7025, 400 Fed. Appx. 369, 371 (10th Cir. Oct. 28, 2010) (unpublished) (no constitutional violation where orthopedist recommended against surgery to treat degenerative disease in plaintiff's knee and hip until the condition "severely affected the quality of his life.").

1.    *Plaintiff's Hearing Condition*

Plaintiff maintains that Defendants were deliberately indifferent to his serious medical needs because he was denied an "ear/hearing examination" by a professional Otolaryngologist ("E.N.T."). (Doc. 8 at 1; Doc. 9 at 1). Plaintiff alleges that his hearing loss was due to a nondescript and undocumented "hearing injury" that occurred in January, 2013 at BCMDC, about which there is no evidence in the record. (Doc. 8 at 2 ¶ 2). Defendants move for summary judgment on the basis that Plaintiff was provided access to assorted ear and allergy medications and had regular follow-up contact with medical-care providers. Therefore, Defendants maintain that Plaintiff has not

demonstrated that any disputed material facts exist to support his Fourteenth Amendment claim as to his hearing issues.

The Court will review the subjective prong of the Eighth Amendment test, as the objective prong is satisfied because Plaintiff's hearing problem was sufficiently serious that Defendants were treating it. Plaintiff maintains that Defendants were deliberately indifferent by failing to refer him for an ear examination and hearing test conducted by an E.N.T.

Defendants determined that Plaintiff's hearing problem was caused by ear-wax buildup and allergies, and provided him with numerous courses of different medications to treat the issue, including ear drops, allergy tablets, nasal sprays, and cautionary prophylactic antibiotics. After receiving several months of treatment, Defendant Trapp suspected Plaintiff of malingering based on his observations of Plaintiff.

As stated above, a prisoner who disagrees with a prescribed course of treatment does not state a constitutional violation. *See Perkins*, 165 F. 3d at 811. The fact that Defendants diagnosed Plaintiff with hearing loss associated with ear-wax buildup and allergies, as opposed to a "hearing injury," and regularly treated him for such, does not demonstrate that Defendants were deliberately indifferent to Plaintiff's medical needs. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (physicians are free to exercise their medical judgment as to the appropriate treatment for a patient, absent an extraordinary degree of neglect). Whether to consult a specialist or undertake additional medical testing are matters that "traditionally fall within the scope of medical judgment." *Id*. Thus, Plaintiff has failed to show that he suffered substantial harm for the sole reason that he was not referred to an E.N.T. to conduct an "ear/hearing examination."

Plaintiff's claim amounts to a disagreement with a prescribed course of treatment and not a constitutional violation. Therefore, the Court recommends that Plaintiff's Fourteenth Amendment claims against Defendants, for allegedly providing insufficient care for his hearing loss, be dismissed with prejudice.

2.    *Dental Care*

Plaintiff maintains that Defendants violated his constitutional rights by refusing to give him a dental examination for his cracked and chipped teeth and provide him with a dental cleaning.[7] (Doc. 8 at 1; Doc. 9 at 1). He further maintains that BCMDC policy entitles him to dental care. (Doc. 8 at 5). Defendants move for summary judgment on this claim.

The dentist at BCMDC examined Plaintiff in 2013 and noted that Plaintiff had a chipped tooth but that he did not require urgent dental work. Plaintiff was asked on March 25, 2013, whether he had any dental problems during a regular check-up, and he responded that he did not. In fact, Plaintiff's first requests for special dental care did not come until January 27, February 5, and February 7 of 2014, which was over three months after he filed this lawsuit. Plaintiff specifically demanded that he receive dental treatment outside of BCMDC. Pursuant to those requests, he was seen by facility medical staff on February 8, 2014, who again observed a hairline crack in one tooth and a chip in another tooth but determined his condition to be non-emergent. Despite stating that he was in pain, Plaintiff declined treatment services and pain medication.

Based on the foregoing facts, the record simply does not support Plaintiff's claim that Defendants were deliberately indifferent to his dental care by failing to provide him

---

[7] Plaintiff states in the Complaint that he sustained dental injuries (cracked tooth, chipped tooth) during transport trips between BCMDC and court, (Doc. 8 at 2), but there is no evidentiary support for his contention in the record.

with a dental examination and a cleaning. Plaintiff has not shown that he was entitled to additional dental care outside of BCMDC, or that the dental care that he was provided at BCMDC was otherwise inadequate. Further, he declined pain management and additional services when offered by facility medical staff.

Again, the record demonstrates that Plaintiff's claim amounts to a disagreement with a prescribed course of treatment and does not rise to a constitutional violation by any individual Defendant in this case. Therefore, the Court recommends that Plaintiff's Fourteenth Amendment claim against Defendants for failing to provide him with dental care be dismissed with prejudice.

### 3.   Right Shoulder MRI

Plaintiff also contends that Defendants violated his constitutional rights by failing to have an MRI taken of his right shoulder. (Doc. 8 at 1; Doc. 9 at 1). He claims that the origins of his right shoulder problems were due to injuries that occurred during transports between BCMDC and court throughout January, February, and March of 2013. (Doc. 8 at 2; Doc. 9 at 1). Defendants have also moved for summary judgment on this claim.

Here, it is undisputed that Plaintiff was evaluated by BCMDC medical staff for his complaints of right shoulder pain. There is also evidence in the record that Plaintiff's right shoulder pain was pre-existing before Plaintiff became incarcerated at BCMDC, and that Plaintiff had been diagnosed with degenerative joint disease and may have sustained injuries while serving in the military. While Plaintiff contends that his right shoulder was injured during transport between BCMDC and court, he does not provide any details of the alleged incidents. Further, he did not alert BCMDC that his right

shoulder was allegedly injured during transport until almost a year after he claims the events occurred.

Plaintiff first complained of right shoulder pain in May, 2013, when he requested an MRI be taken of his right shoulder without any additional information as to his shoulder condition. The next time he requested treatment for his right shoulder was two months later to Dr. Alladi. Dr. Alladi had an x-ray taken of Plaintiff's shoulder and the x-rays were negative for any injury to his shoulder.

Plaintiff did not request any medical care for his right shoulder until January 27, 2014, when he again demanded an MRI be taken of his right shoulder. When he was evaluated by medical personnel, they indicated that the alleged limitations caused by his right shoulder were plainly inconsistent. There are no additional requests for treatment while Plaintiff was at BCMDC as to Plaintiff's right shoulder.

Plaintiff's right shoulder was examined on numerous occasions by BCMDC staff, and x-rays were taken of his shoulder to determine if there was any injury to the shoulder. The mere fact that Plaintiff demanded an MRI and was provided with an x-ray instead does not demonstrate that any of the Defendants were deliberately indifferent to his serious medical needs. Plaintiff has not shown that he was entitled to an MRI, or that the x-ray of his shoulder and other medical care for his shoulder that he was provided at BCMDC were inadequate in some way. Further, Plaintiff has not demonstrated that he was significantly harmed by Defendants' failure to provide him with an MRI.

Plaintiff's claim that his constitutional rights were violated because Defendants did not provide him with an MRI is simply a disagreement with a prescribed course of treatment and does not rise to a constitutional violation by any Defendant in this case.

Therefore, the Court recommends that Plaintiff's Fourteenth Amendment claim against Defendants for failing to provide him an MRI for his right shoulder be dismissed with prejudice.

### 4. Hernia Condition

Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs by failing to provide him with hernia repair surgery. (Doc. 8; Doc. 9 at 1). In support of this claim, he contends that his hernia was caused by numerous transports between BCMDC and court, and that the first injury occurred in February, 2013. (Doc. 8 at 2). He maintains that he experienced extreme pain due to his hernia between March 8, 2013 and September, 2013, and that Defendants refused to refer him for surgery. (Doc. 8 at 2, 5). Defendants move for summary judgment as to this claim.

As an initial matter, there is no evidence in the record to support Plaintiff's contention that Plaintiff's hernia was caused by trauma during transport. Furthermore, Defendant Trapp first noticed Plaintiff's hernia in March, 2013, and observed it only protrudes on valsalva and therefore was not life threatening. He determined Plaintiff's pain to be intermittent. Plaintiff was also provided a hernia belt to prevent pain and incarceration or strangulation of the hernia, and pain medication when it was requested, to treat the hernia. Plaintiff's hernia was surgically repaired on October 30, 2013.

Delay in medical care is only "sufficiently serious" to meet the objective element of the deliberate indifference test if the plaintiff can show that the delay resulted in substantial harm. *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000). Here, Plaintiff contends that he experienced multiple pain episodes due to his hernia over several months until he received surgery. While pain and suffering may rise to

27

substantial harm, "not every twinge of pain suffered as the result of delay in medical care is actionable." *Id.* The evidence taken in the light most favorable to Plaintiff suggests that the pain he alleges to have suffered was not *de minimus.* Therefore, the Court finds that there is a material dispute about whether Plaintiff met the "sufficiently serious" criteria for his claim.

Thus, the Court turns to the subjective component of the test and whether there is evidence to show that Defendants were deliberately indifferent to the pain and suffering caused by his hernia. Deliberate indifference is evidenced by the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104.

Where a prisoner plaintiff argued that prison officials had violated the Eighth Amendment by delaying his spinal surgery for almost two years, the Tenth Circuit found there was no evidence of deliberate indifference because the plaintiff was being treated in accordance with the recommendations of the physician. *Johnson*, 400 Fed. Appx. at 371. The physician had recommended that surgery be postponed until the condition severely affected the quality of the prisoner's life, and the record showed that he was given pain medications, a cervical collar, a walker, and placed on bed rest. *Id.* at 370–71.

The Tenth Circuit similarly held that there was no factual basis for deliberate indifference where a prisoner plaintiff alleged that the prison failed to provide him with a heart specialist and surgery, causing him to suffer for 18 months until he received what his prison doctor deemed to be elective heart surgery. *Olson v. Stotts*, 9 F. 3d 1475, 1476 (10th Cir. 1993). Reading his complaint and response to the *Martinez* report liberally, the Tenth Circuit found that the evidence demonstrated that the plaintiff had

received appropriate treatments and effective medication during the period of alleged delay. *Id.* Therefore, the Tenth Circuit reasoned that the factual basis for his claim amounted to a mere disagreement with the medical judgment of the prison doctor, believing that he should have received his elective surgery sooner than he did. *Id.*

The record demonstrates that Plaintiff was regularly evaluated by prison doctors and offered pain medication for his hernia condition. Defendants exercised appropriate medical, discretionary authority in prescribing the hernia belt and pain medication, and referred him for surgery when it was deemed necessary. That the UNM Hospital General Surgery Department waited over four weeks between initially evaluating Plaintiff and conducting his surgery is further evidence Plaintiff's need for surgery was not an emergent or immediate need.

Thus, pursuant to the case law of this Circuit, the acts that Plaintiff complains of do not show that Defendants acted with deliberate indifference. Defendants adequately addressed Plaintiff's medical needs by providing him with a hernia belt, pain medication, and education. Plaintiff's disagreement with his treatment is that he was not provided immediate surgery. Again, "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins,* 165 F.3d at 811.

Plaintiff has not shown that the treatment he was prescribed was inadequate, except that on some days he was in pain due to his hernia. Plaintiff's claim that his constitutional rights were violated because Defendants did not provide him with surgery when he requested it does not establish that they violated his constitutional rights.

Therefore, the Court recommends that Plaintiff's constitutional claims against Defendants for failing to provide him with surgery be dismissed with prejudice.

5.   <em>Plaintiff's Medications and Prescriptions</em>

Plaintiff alleges that Defendant Trapp and Defendant McMurray were deliberately indifferent to his serious medical needs by "refus[ing] to write prescriptions for medications [he] required," as ordered by his previous medical providers to treat his various ailments, deficient immune system, and epilepsy condition. (Doc. 1 at 2–4). He provides a litany of medications that he was taking before his incarceration in BCMDC, which he claims he was not provided upon entering BCMDC.[8] (Doc. 1 at 2). He contends that these prescriptions are necessary because he is an older person who has had over 80 surgeries, and that he has been denied medication for his epilepsy seizures and deficient immune system. (*Id.* at 2–4).

As an initial matter, there is no evidence to support Plaintiff's claim that he has undergone over 80 surgeries or that he suffers from a deficient immune system. Further, the record demonstrates that Plaintiff was provided with approximately 81 separate dosages of various medications, vitamins, and supplements for every ailment of which he complained while incarcerated at BCMDC. (See Doc. 47, Ex. G). These medications were provided for Plaintiff's diminished hearing capacity, allergies, pain, multivitamins, enlarged prostate, seizure disorder, for the prevention of coronary artery disease, constipation and irregularity, chronic obstructive pulmonary disease, the

---

[8] These medications specifically include the following: therapeutic M (a multivitamin), calcium/magnesium (a nutritional supplement), glucosamine (a supplement used to treat joint pain associated with arthritis), pomegranate (used to reduce symptoms of chronic obstructive pulmonary disease), omega-3 (a nutritional supplement), calcium/D (a nutritional supplement), Fosamax (used to treat or prevent weakening of bones), alfuzosin (used to treat benign prostatic hypertrophy), flunisolide (a steroid used to prevent asthma attacks), omeprazole (used to treat heartburn and acid reflux disease), carboxymethylcellulose (used to prevent dry eyes), clonazepam (used to prevent seizures), and camphor-sarna cream (lotion used to treat dry skin). (Doc. 1 at 2–3; Doc. 47 at 27–28).

common cold, asthma, and acid reflux. The record also demonstrates that these medications and treatments were provided in a timely fashion, as Plaintiff did not indicate that his symptoms or ailments were emergent.

Plaintiff's medications were not the exact same type as what he had been prescribed prior to entering BCMDC. However, Plaintiff was unable to articulate the medications he was taking prior to incarceration, and BCMDC requested Plaintiff's medical records from the VA Hospital on several occasions and never received a response.

Further, Plaintiff is not entitled to any particular course of treatment. Health care professionals are "free to exercise their professional judgment" with respect to an incarcerated individual's medical needs. *See Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997). Here, Defendants treated Plaintiff's complaints in a way that was medically appropriate and reasonable under the circumstances. Plaintiff has not refuted any of the medical records presented by Defendants demonstrating that medical care was in fact provided.

Specifically, with regard to Plaintiff's seizure disorder, Plaintiff was regularly prescribed medications and evaluated by health care personnel. His chief complaint with his care is with the medication he was prescribed. However, given the conflicting and subjective nature of the symptoms that Plaintiff reported, Defendants exercised appropriate medical, discretionary authority in prescribing anti-seizure medication, and Plaintiff was treated for his seizure disorder except when he refused care or medication. Plaintiff does not maintain that he was substantially harmed because he did not receive

his preferred medicine. Thus, Defendants were not deliberately indifferent to Plaintiff's needs.

Plaintiff has also not shown or alleged that the medications that he was provided to treat his various ailments were inadequate in some way. Plaintiff's claim that his constitutional rights were violated because Defendants did not provide him with the exact course of medication he desired does not rise to a constitutional violation by any of the Defendants in this case. Therefore, the Court recommends that Plaintiff's constitutional claims against Defendants for failing to provide him with specific medication be dismissed.

B.    *Eighth and Ninth Amendment Claims*

Plaintiff alleges Defendants violated his Eighth and Ninth Amendment rights, but does not allege any facts in support of those allegations. The Court reviews these claims pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 12(b)(6).

First, at the time that Plaintiff was housed at BCMDC and the events giving rise to his Complaint occurred, he was a pretrial detainee and not a convicted prisoner. As explained above, his claims for deliberate indifference as to his serious medical needs are properly before the Court pursuant to the Due Process Clause, and not the Eighth Amendment. Plaintiff's Eighth Amendment claims should therefore be dismissed on the basis that Plaintiff was a pretrial detainee. *See Dubuc v. Johnson*, No. 99-5107, 201 F.3d 447, at *1 (10th Cir. Dec. 3, 1999) (unpublished).

Second, the Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The Ninth Amendment is not an independent source of individual rights, but a

rule of construction to be applied in certain cases. *Lomax v. Lander*, No. 13-CV-0707-WJM-KMT, 2014 WL 1584219, at *6 (D. Colo. Apr. 21, 2014) (citation omitted). The Tenth Circuit Court of Appeals has held that because other amendments, such as the Eighth Amendment, specifically address the mistreatment of prisoners, Ninth Amendment claims are indisputably meritless. *Parnisi v. Colo. State Hosp.,* No. 92-1368, 1993 WL 118860, at *1 (10th Cir. Apr. 15, 1993) (unpublished).

Accordingly, Plaintiff's Eighth and Ninth Amendment claims should be dismissed with prejudice.

### C.   Medical Negligence

Plaintiff also suggests that Defendants' actions and inactions in treating him at BCMDC amounted to medical negligence. Defendants also move for summary judgment on this claim.

"Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs." *Durflinger v. Artiles*, 727 F.2d 888, 899 (10th Cir. 1984). To succeed on a claim for negligence, the plaintiff "must show: (1) a causal connection between the duty breached and the injury received; and (2) he or she was damaged by the negligence." *Id.*

The record shows that Plaintiff was provided with regular care and treatment while at BCMDC. He has failed to come forward with any evidence, beyond his own statements, to show that the treatment he received by individual Defendants fell below the standard of care that was owed to him. Instead, the record before the Court demonstrates that Plaintiff's complaints and requests for care were regularly addressed

by Defendants in a timely manner. Plaintiff has not set forth in even a conclusory manner how Defendants violated all of the elements required for medical negligence.

For these reasons, the Court recommends that Plaintiff's claim for medical negligence also be dismissed with prejudice.

## V.   Conclusion

For the reasons stated above, the Court recommends that *Defendants Correctional Healthcare Companies, Timothy Trapp, M.D., Timothy McMurray, M.D., Laura Velez, Carla Eide, M.D., and Jon Hamilton, M.D.'s* Martinez *Report*, (Doc. 47), and *Defendants Correctional Healthcare Companies, Timothy Trapp, M.D., Timothy McMurray, M.D., Laura Velez, Carla Eide, M.D., and Jon Hamilton, M.D.'s* Supplement *to* Martinez *Report* filed December 1, 2014, (Doc. 52), be **GRANTED**, and all of Plaintiff's claims be **DISMISSED WITH PREJUDICE**.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE